**Francis ROY, M.D., Plaintiff–Appellee,**

v.

**BLEDSOE COMMUNITY HOSPITAL, INC., Defendant–Appellant.**

No. 01–6009.

United States Court of Appeals, Sixth Circuit.

Feb. 19, 2003.

Before: GUY and MOORE, Circuit Judges; and BECKWITH,* District Judge.

## OPINION

MOORE, Circuit Judge.

Plaintiff–Appellee Dr. Francis Roy ("Roy") entered a fixed-term employment contract with Defendant–Appellant Bledsoe Community Hospital, Inc. ("Hospital"). Pursuant to the contract, Roy was obligated to provide some emergency room coverage. Initially, he covered the emergency room during the daytime on weekdays only when he would be on-call in the evening, but he subsequently agreed to do so even when he was not on-call in the evening. According to Roy, he provided such coverage on a temporary, voluntary basis, as a favor to the Hospital. According to the Hospital, Roy was required to provide this coverage pursuant to a modification of his employment contract. When Roy refused to continue providing this coverage, the Hospital terminated him.

Roy brought suit against the Hospital for breach of contract and conversion. After a jury trial, the district court entered judgment for Roy on both counts. The Hospital appeals, claiming that there was

---

* The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio.

insufficient evidence to support the jury's verdict that the Hospital breached its contract with Roy. Because there is sufficient evidence on the record for the jury to accept Roy's interpretation of the contract, we AFFIRM the district court's judgment with respect to the breach of contract claim.

## I. FACTS AND PROCEDURE

Roy and the Hospital entered a written agreement outlining the terms of his employment on November 5, 1999. William Keith Smith ("Smith"), the Hospital's Chief Executive Officer, drafted the following agreement:

Welcome to Bledsoe and to The Family Care Center. The following points will summarize a final offer of employment with our facility:

- $120,000 per year salary as an employee income guarantee
- Benefit package for a full-time employee including medical insurance
- one year contract beginning January 1, 2000
- 20 days per year paid time off for vacation, holiday, sick leave, CME, etc.
- compensation every two weeks, with all applicable taxes withheld
- working full time in Clinic with FNP, arranging for some extended hours and Saturday A.M. coverage between the two Practitioners
- long range beeper provided for you at no cost
- paid Malpractice Insurance
- $10,000 up front money to cover sign-on bonus, moving expenses, and CME
- at end of 1 year you will be given the practice and presently existing equipment
- ER schedule/rotation

- at the end of the first year, a settlement will be made with profits from the Clinic being split on a 50/50 basis (all revenue of clinic—expenses). You will be given monthly report of statistics.

If you agree with the above terms, please sign both copies of this summary and return one to us.

J.A. at 17. Roy and Smith signed the "summary," and it became a valid and binding contract. The parties agree, however, that the written contract did not set forth all terms of Roy's employment.

The parties dispute the significance of Roy's contractual obligation to participate in the "ER schedule/rotation." According to Roy, Smith explained during negotiations that Roy would simply provide emergency room coverage on evenings and weekends as an independent contractor. According to Smith, Roy was required to provide weekday daytime emergency room coverage as well, at least when he was scheduled to cover the evening rotation. In fact, initially Roy provided only occasional emergency room coverage on nights and weekends.

The parties also disagree about whether they modified Roy's employment contract to require additional emergency room coverage. Soon after Roy began work, Smith asked Roy to provide backup emergency room coverage regularly during weekdays. According to Roy, Smith indicated that this was a "temporary back-up measure," and that Roy would be doing Smith a favor. J.A. at 110 (Roy Direct). According to Smith, Roy agreed to modify his employment contract to include this obligation. Although Roy would not receive additional compensation for the service, under Smith's view, Roy would have an opportunity to develop his practice at the Hospital's Family Care Center by working with emergency room patients.

Roy summarized the proposed arrangement in writing and submitted it in the form of handwritten notes to Smith:

[T]his will change the way that we have provided ER coverage in the past. The local doctors will be responsible for seeing their true emergency patients during the hours of 7:00 a.m. to 6:00 p.m. Dr. Roy will be available to provide coverage to the ER during those hours if there is no other coverage.

J.A. at 78–79 (Roy Notes). The Hospital maintains that this was a written modification of the employment contract. However, both parties concede that this was only Roy's draft of a proposed Hospital policy, which was never formally implemented.

Shortly after Roy began providing additional emergency room coverage, he had disagreements with two hospital officials, Chief Financial Officer Stephanie Boynton ("Boynton") and Chief Nursing Officer Frances Killian ("Killian"). Roy felt that Boynton and Killian had usurped his authority at the Hospital. One day Roy simply refused to come see emergency room patients, allegedly explaining to Killian "that since [she] had decided to micromanage everything, that [she] could just manage the emergency room patients, also." J.A. at 219 (Killian Direct). Roy also informed Smith that "Dr. Stephanie" or "Dr. Fran" could see the patients. J.A. at 117–19 (Roy Direct). According to Smith, Roy "said he felt like [Boynton and Killian] had undermined his authority and usurped his authority to the point that he couldn't treat patients in the emergency room any longer." J.A. at 241 (Smith Direct). Smith instructed Roy twice to the see the patients, but Roy did not.

The Hospital terminated Roy's employment the following day, identifying only Roy's refusal to see emergency room patients as a cause for termination. The Hospital did not return any of Roy's personal property for nearly two months, and allegedly has yet to return all of his property.

Roy brought suit in state court against the Hospital for breach of contract and conversion. The Hospital removed the case to federal court on diversity grounds.

A jury trial was held on May 29, 2001. Following the testimony of Roy, Smith, Boynton, and Killian, the trial judge submitted the case to the jury. The jury instructions stated, in part:

Roy claims that Bledsoe Community Hospital breached a one-year employment contract by terminating him without cause. To terminate a contract for a specific employment term, such as the one between Roy and Bledsoe Community Hospital, the terminating party must have good cause to do so. . . .

* * *

. . . . The Hospital discharged Roy without good cause if the employment contract, either as written or as orally modified, did not require him to treat the Hospital's emergency room patients during normal daytime work hours. If, on the other hand, you find the employment contract, either as written or orally modified, required Roy to perform emergency room services during normal daytime work hours, then you will find that Roy was discharged with good cause, and Roy cannot recover on his contract claim.

J.A. at 266–68 (Instr.).

The jury found that the Hospital was liable to Roy for $155,000 for breach of contract and $2,000 for conversion. The Hospital filed a motion for judgment as a matter of law or, in the alternative, a new trial, and the district court denied the motion. The Hospital appeals, arguing that

there was insufficient evidence to hold the Hospital liable for breach of contract.[1]

## II. ANALYSIS

### A. Questions Submitted to the Jury

■ The Hospital argues that the district judge improperly submitted the issue of contract interpretation to the jury because it was a question of law, not a question of fact. Where a written contract is unambiguous, its interpretation is a question of law to be resolved by the court. *Hibernia Bank & Trust Co. v. Boyd,* 164 Tenn. 376, 48 S.W.2d 1084, 1086 (.1932). However, where a written contract is ambiguous, its interpretation is a question of fact that should be submitted to the jury. *Hendrix v. City of Maryville,* 58 Tenn. App. 457, 431 S.W.2d 292, 297 (1968).

The district judge "found the term 'ER schedule/rotation' and the nature of Roy's obligation to provide ER coverage ambiguous" and left the question for trial. J.A. at 57. We review this determination de novo because it is a question of law. *Tennessee Consol. Coal Co. v. United Mine Workers of Am.,* 416 F.2d 1192, 1198 (6th Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970). Under Tennessee law, the language of a contract is ambiguous if it "is susceptible of more than one reasonable interpretation." *Memphis Hous. Auth. v. Thompson,* 38 S.W.3d 504, 512 (Tenn.), *cert. denied,* 534 U.S. 823, 122 S.Ct. 59, 151 L.Ed.2d 27 (2001). But ambiguity "does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions." *Johnson v. Johnson,* 37 S.W.3d 892, 896

(Tenn.2001) (quotation omitted). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Warren v. Metropolitan Gov't,* 955 S.W.2d 618, 623 (Tenn.Ct.App.1997).

The district court summarized the "widely divergent meanings" that Roy and the Hospital ascribed to the "ER schedule/rotation" clause as follows:

> According to [the Hospital], "ER schedule/rotation" shows Roy agreed from the inception of his employment to see ER patients during the daytime hours on weekdays when he was scheduled for nighttime ER duty. Roy disagrees, maintaining he never agreed to any daytime ER coverage prior to beginning work. According to Roy, the term "ER schedule/rotation" refers solely to his providing nighttime and weekend coverage on a rotating basis.

J.A. at 56 (D. Ct. Mem. Op. April 25, 2001). We agree that no certain meaning can be discerned from the phrase "ER schedule/rotation." In fact, the parties' divergent views demonstrate that the term can fairly be understood in at least two ways. Therefore, we agree with the district court that this written term is ambiguous and conclude that the issue of contract interpretation was properly submitted to the jury.[2]

### B. Sufficiency of the Evidence

■ "[I]n diversity cases the federal courts are bound by state law in determining whether there is sufficient evidence to support a jury's verdict." *Gold v. Nation-*

---

1. The Hospital does not contest its liability for conversion or the amount of damages awarded by the jury.

2. The district court also appropriately submitted to the jury the question of whether Roy's employment contract was modified to require

daytime emergency room coverage. "Whether a contract has been modified by the parties is a question of fact for the trier of fact." *Glanton v. Shelby Ins. Co.,* 1996 WL 82678, at *3 (Tenn.Ct.App. Feb.28, 1996) (quotation omitted).

*al Sav. Bank,* 641 F.2d 430, 434 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981). Under Tennessee law, when a court evaluates the sufficiency of the evidence, "all the evidence for the prevailing party must be taken as true. Moreover, all reasonable inferences favorable to the prevailing party must be made and all countervailing evidence must be disregarded." *Id.* If a court finds "evidence from which a trier of facts, if he were inclined to believe it, could reach the conclusion reached, then, the judgment based thereon must be affirmed." *Hohenberg Bros. Co. v. Missouri Pac. R. Co.,* 586 S.W.2d 117, 119–20 (Tenn.Ct.App.1979). An appellate court can reverse a verdict only if it "finds that a reasonable mind could reach only one conclusion and that conclusion is contrary to the verdict." *Holloway v. Collier,* 969 S.W.2d 407, 408 (Tenn.Ct.App.1997).

The jury found that Roy "proved by a preponderance of the evidence defendant Bledsoe Community Hospital breached the employment contract by terminating him without good cause."[3] J.A. at 276 (Jury Verdict). Because the Hospital would not be in breach of contract for terminating an employee who failed to perform his contractually required duties, the jury must have concluded that Roy was not contractually obligated to provide daytime emergency room services. We conclude that, as a matter of law, there was sufficient evidence on the record for a jury to reach this conclusion.

The employment contract provides that Roy will participate in the "ER schedule/rotation," but does not describe the obligation. According to Roy, Smith explained this provision to mean that Roy "would pull coverage in the evening and on weekends." J.A. at 105 (Roy Direct). Roy and Boynton testified that the contract did not oblige Roy to provide emergency room coverage during weekday daytime hours. Furthermore, the Hospital stipulated that Roy had at all times "performed his duties under and pursuant to said contract, as a licensed, practicing physician." J.A. at 62 (Final Pretrial Order). If the jury was inclined to believe this evidence, it could conclude that the initial contract did not require daytime emergency room services.

There is also sufficient material evidence to support the jury's finding that the employment contract was not modified to require Roy's provision of daytime emergency room coverage. Under Tennessee law, a contract can be modified by subsequent agreements, documents, or actions, as long as there was a meeting of the minds and consideration was present. *Prudential Secs., Inc. v. Mills,* 944 F.Supp. 631, 635 (W.D.Tenn.1996). Roy testified that he began to provide daytime emergency room coverage "when [Smith] came sort of on the side and asked me if I would do him a favor and take care of patients during the day but only as a temporary back-up measure." J.A. at 110 (Roy Direct). Roy suggests that his conduct never manifested a meeting of the minds about modifying his employment obligations. Furthermore, Roy testified that his written plan for altering emergency room coverage was simply a proposal that might become policy if approved by the medical staff. Even Smith described Roy's letter as "just sort

---

**3.** Neither party objected when the district court instructed the jury that a finding of good cause turned on whether the contract required Roy to perform weekday daytime emergency room services. Therefore, we need not consider the Hospital's argument on appeal that, regardless of Roy's contractual obligations, there was good cause because Roy disobeyed orders from his superior and refused to see patients requiring emergency medical attention.

of his ideas about how we could work ... out" inefficiencies in daytime emergency coverage. J.A. at 170–71 (Smith Direct). Smith never formally implemented the policy. This evidence is sufficient for a reasonable juror to conclude that Roy was not obligated to provide daytime coverage in the emergency room and was therefore free to discontinue his voluntary service.

Therefore, we conclude that there was sufficient evidence for the jury to conclude that the Hospital lacked good cause to terminate Roy's employment and breached the employment contract by doing so.

### III. CONCLUSION

For the above reasons, we **AFFIRM** the judgment entered by the district court.