RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JERRY DUNCAN, et al.,

*Plaintiffs,*

CHARLES T. EVANS; DAVID MCBRIDE; RONALD E. FARLEY; LARRY J. SIMPSON; ROBERT B. BONDS; STEVE HINCH,

*Plaintiffs-Appellants,*

*v.*

LEONARD J. MUZYN, et al.,

*Defendants,*

TENNESSEE VALLEY AUTHORITY RETIREMENT SYSTEM; TENNESSEE VALLEY AUTHORITY,

*Defendants-Appellees.*

No. 17-5389

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cv-00217—Aleta Arthur Trauger, District Judge.

Argued: January 31, 2018

Decided and Filed: March 16, 2018

Before: MOORE, THAPAR, and LARSEN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellee Tennessee Valley Authority Retirement System. Edward C. Meade, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee Tennessee Valley Authority. **ON BRIEF:** Michael J. Wall, James G. Stranch, III, R. Jan Jennings, Michael G. Stewart, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellants. Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, James S. Christie, Jr., BRADLEY ARANT BOULT CUMMINGS LLP,

Birmingham, Alabama, for Appellee Tennessee Valley Authority Retirement System. Edward C. Meade, James S. Chase, Frances Regina Koho, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee Tennessee Valley Authority.

THAPAR, J., delivered the opinion of the court in which LARSEN, J., joined. MOORE, J. (pp. 10–18), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge. Underfunded public pensions are a vexing public-policy issue. *See generally* Jack M. Beermann, *The Public Pension Crisis*, 70 Wash. & Lee L. Rev. 3 (2013). One answer is to cut benefits, *see id.* at 31, 86, but unsurprisingly, that often proves controversial. So it was here. Jerry Duncan and a class of pension-plan participants sued their employer and its pension system when the system cut their benefits. Their suit has already produced one appeal before this court. *Duncan v. Muzyn*, 833 F.3d 567 (6th Cir. 2016). They now pursue the second.

I.

The Tennessee Valley Authority (TVA) provides funding for the Tennessee Valley Authority Retirement System ("the Plan"). A seven-member board ("the Board") administers the Plan and manages its assets. And the Plan, in turn, provides defined benefits to participants. That means the Plan, by way of the TVA's contributions, pays a pension benefit to participants in a defined amount. *See West v. AK Steel Corp.*, 484 F.3d 395, 399 (6th Cir. 2007) ("Under a defined benefit plan, an employee's benefit is an amount, either in the form of an annuity or a lump-sum payment, equal to a specified percentage of the employee's salary in the final years of his or her employment."). As is key here, the benefit includes a cost-of-living adjustment.

In 2009, the Plan found itself in financial trouble. Thanks in no small part to the recession, the Plan's liabilities exceeded its assets and it needed to make some changes to ensure its long-term stability. So the Board cut some benefits. These cuts included temporarily lowering cost-of-living adjustments while also increasing the age at which certain Plan

participants would first become eligible to receive cost-of-living adjustments. This litigation followed.

There are two issues in this appeal. First, Plaintiffs maintain that the Board failed to give proper notice to the TVA and Plan members before it made the cuts. Second, Plaintiffs contend that the Board violated the Plan's rules by paying their cost-of-living adjustments for certain years out of the wrong account. The district court granted summary judgment for the TVA and the Board on both claims. We review de novo. *Richmond v. Huq*, 879 F.3d 178, 186 (6th Cir. 2018).

II.

Plaintiffs first argue that the Board's cuts to cost-of-living adjustments failed to comply with the Plan's notice rules. Section 13 of the rules lays out what notice is required. Under Section 13, the Board must give at least thirty days' notice of a proposed amendment to the TVA and Plan members. Then, the TVA "may, by notice in writing addressed to the [B]oard within said 30 days, veto any such proposed amendment, in which event it shall not become effective." R. 126-6, Pg. ID 1601. The parties disagree about whether the Board must provide notice to the TVA and Plan members *before* voting to approve an amendment, as Plaintiffs contend, or after, as occurred here.

The TVA and the Plan argue that their interpretation is entitled to *Auer* deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (deferring to an agency's interpretation of its own regulation). Plaintiffs, by contrast, ask us to apply another rule, *contra proferentem*, which directs courts to construe ambiguous contract language against the drafter. In other words, the parties invite us both to defer to the drafter pursuant to *Auer* and to construe against the drafter pursuant to *contra proferentem*. We cannot do both, and we know of no test that would help us sort out which rule, if either, should win in a case like this.[1] Fortunately, we need not resolve this issue, because Section 13 is not ambiguous.

---

[1]Whether the Plan's rules and regulations should be interpreted as a "contract" is a difficult question we need not decide. We have remarked that the rules and regulations making up the Plan have the force of law. *Tenn. Valley Auth. v. Kinzer*, 142 F.2d 833, 837 (6th Cir. 1944) (explaining that the Plan's rules and regulations "have become embedded in the law; and are to be given the same force and effect as the [Tennessee Valley Authority Act],

After all, simply calling something ambiguous does not make it so.  Indeed, determining the point at which "ambiguousness constitutes an ambiguity" is no easy task.  *United States v. Hansen*, 772 F.2d 940, 948 (D.C. Cir. 1985) (Scalia, J.).  Contract language is not ambiguous merely because the parties interpret it differently.  *Roy v. Bledsoe Cmty. Hosp., Inc.*, 61 F. App'x 930, 934 (6th Cir. 2003).  Rather, our court has previously stated that a contract must be "subject to two reasonable interpretations" to be ambiguous.  *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996) (citation omitted).  This, of course, begs the question: When are two interpretations reasonable?  Obviously, when a contract's language supports both interpretations equally, both are reasonable and the contract is ambiguous.  Alternatively, a contract's language might permit of *no* reasonable interpretation, in which case it would be ambiguous as well.  Framing the inquiry in terms of "reasonable interpretations," then, does not get us far.  Rather, where, as here, one interpretation far better accounts for the language at issue, the language is not ambiguous.

Here, Section 13's meaning is plain.  Recall Section 13's notice requirement:  The Board must give at least thirty days' notice of a proposed amendment to the TVA and Plan members, after which the TVA may "veto any such proposed amendment" within the thirty-day period, "in which event it shall not become effective."  R. 126-6, Pg. ID 1601.  The best reading of Section 13 is that it requires notice only *after* the Board has voted to approve an amendment.

---

itself").  In contrast, courts have interpreted similar benefit plans like contracts.  *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 712 (6th Cir. 2000) ("General rules of contract interpretation incorporated as part of the federal common law of contract interpretation guide us in construing an ERISA plan.").  And while the Plan is not governed by ERISA, *Duncan*, 833 F.3d at 571, we have previously treated ERISA cases as "closely analogous," *Beaman v. Ret. Sys. of Tenn. Valley Auth.*, 928 F.2d 1132, at *3 (6th Cir. 1991) (table).  To the extent that the Plan *is* like a contract, one might fairly question why the TVA's expertise would merit deference to its interpretation of ambiguous contract language.  *Cf. Scenic Am., Inc. v. Dep't of Transp.*, 138 S. Ct. 2, at *2–3 (2017) (Gorsuch, J., concurring in denial of certiorari) ("Whether *Chevron*-type deference warrants a place in the canons of contract interpretation is surely open to dispute.").  At the same time, it is not clear that the rule of *contra proferentem* should apply in this context.  *Compare Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846–47 (6th Cir. 2000) ( "[T]o the extent that [an ERISA] Plan's language is susceptible of more than one interpretation, we will apply the rule of *contra proferentem* and construe any ambiguities against . . . the drafting parties." (citation and internal quotation marks omitted)), *with Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 81–82 (6th Cir. 2009) (criticizing *University Hospitals of Cleveland* and stating that when a "denial of benefits is reviewed under the arbitrary and capricious standard because of the discretion conferred by the Plan, we believe that invoking the rule of *contra proferentem* undermines the arbitrary and capricious standard of review").

To understand why, focus on two words in Section 13: "veto" and "effective." First, consider "veto." The TVA may "veto any such proposed amendment" during the thirty-day notice period. The Plan's rules do not define veto. But the term typically connotes a power to nullify a formal action by another body. *E.g.*, *Veto*, *Black's Law Dictionary* (10th ed. 2014) (defining veto as "[a] power of one governmental branch to prohibit an action by another branch; esp., a chief executive's refusal to sign into law a bill passed by the legislature"). The average American no doubt associates "veto" with the President's ability to reject legislation that Congress has voted to enact. *See* U.S. Const. art. I, § 7, cl. 2; Schoolhouse Rock!, *I'm Just a Bill*, YouTube (Sept. 1, 2008), http://www.youtube.com/watch?v=tyeJ55o3El0, at 2:28–2:35 ("You mean even if the whole Congress says you should be a law, the President can still say no? . . . Yes, that's called a veto.").

Next, consider "veto" along with "effective." If the TVA vetoes a proposed amendment, "it shall not become effective." The natural inference from this language is that if the TVA does *not* veto a proposed amendment, it *shall* become effective—"in operation at a given time." *Effective*, *Black's Law Dictionary* (10th ed. 2014); *cf.* U.S. Const. art. I, § 7, cl. 2 ("If any Bill shall not be returned by the President . . . after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it . . . ."). Otherwise, the inclusion of the phrase "it shall not become effective" would be surplusage, because the word "veto" alone indicates that the TVA's decision to reject the proposed amendment would render the proposed amendment ineffective. Taken together, "veto" and "effective" indicate that the Board's Section 13 notice informs the TVA that the Board has voted to adopt an amendment and, if the TVA does not veto it within thirty days, the amendment will become effective. *Cf. Duncan*, 833 F.3d at 571 (discussing Section 13 and observing that "amendments proposed by the board become effective only if the TVA does not exercise its veto within thirty days").

Plaintiffs offer an alternative interpretation. They suggest that a veto could occur before the Board takes a final vote, thereby "kill[ing]" a nascent amendment and rendering it ineffective. But using "veto" and "effective" in this counterintuitive manner would read a procedure into Section 13 that does not jive with its text. Under Plaintiffs' interpretation, the Board would vote twice—once to provide notice that it was *considering* an amendment and

again to reaffirm the amendment after the veto period has passed. And in between votes, the amendment would not become effective (even though Section 13 indicates it should) because the Board has not yet voted to reaffirm itself. The Board presumably could then change its mind and elect not to reaffirm, thereby invalidating an otherwise effective amendment. This would essentially give the Board a *super*-veto (when Section 13's plain language gives the TVA the final say) and render the whole process a confusing waste of time. These unusual consequences illustrate that Plaintiffs cannot reasonably account for Section 13's use of "veto" and "effective."

Of course, Section 13 does speak of a "proposed" amendment. And, standing alone, it might seem odd to call an amendment "proposed" once the Board has already voted to adopt it. But when one considers "proposed" in light of the remainder of Section 13, it becomes clear that the Board proposes an amendment to the TVA, which must then choose whether to veto it. Plan members also receive thirty days' notice of the proposed amendment, giving them time to lobby the TVA or change their retirement plans, or even just prepare for the worst, before the amendments take effect. And while thirty days may be too little time to make some changes to their retirement plans, Section 13's plain language nevertheless controls.[2]

Because Section 13 is not ambiguous, we need not defer to the TVA and the Plan's interpretation under *Auer*, nor construe Section 13 against them under the rule of *contra proferentem*.[3] Under Section 13's plain language, the Board properly gave notice of the 2009 amendments after it voted to approve them.

## III.

Plaintiffs also appeal the district court's rejection of their claim that the Board violated Plan rules by paying cost-of-living adjustments for certain years out of the wrong account. But whatever the claim's merits, Plaintiffs lack standing to bring it. *See Town of Chester v. Laroe*

---

[2]In addition, Plaintiffs ask us to read something like the Administrative Procedure Act's notice-and-comment procedure into Section 13. But the APA does not govern the Plan, *Duncan*, 833 F.3d at 575, and Section 13 speaks for itself.

[3]For the same reason, we need not decide whether the ambiguity that triggers *Auer* deference differs from ambiguity in a purely contractual setting. We assume without deciding that courts should determine ambiguity the same in each circumstance.

*Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (explaining that a plaintiff must have standing for each claim brought).

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. And there is no case or controversy if a plaintiff lacks standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum" of standing comprises three elements: (1) an injury-in-fact, which is (2) fairly traceable to the defendant's challenged conduct, and that in turn is (3) likely redressable by a favorable judicial decision. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In addition, an injury-in-fact must be "particularized," meaning it "affect[s] the plaintiff in a personal and individual way." *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). And it must be "concrete," meaning that it "actually exist[s]." *Id.*

So what is Plaintiffs' injury here? Start with what it is not: any actual loss or decrease in their benefits. Unlike other provisions of the 2009 amendments that spawned this litigation, the Board's challenged accounting actions withheld no benefits from Plaintiffs. Or in other words, nothing with respect to this claim hit Plaintiffs in their pocketbooks.

Instead, Plaintiffs claim that they are injured because the Board paid their cost-of-living adjustments out of the wrong account (the "Excess COLA Account"). In Plaintiffs' view, the Board should have paid the adjustments out of the "Accumulation Account." But "a bare procedural violation" of the Plan's rules, "divorced from any concrete harm," does not constitute an injury-in-fact. *Id.* at 1549. And upon closer examination, the Board's alleged accounting error is nothing more than a bare procedural violation. At a high level of generality, Plaintiffs' purported injury stems from the Board's supposed mismanagement of a surplus savings account. This surplus savings account contained funds left over after the TVA made its minimum yearly contribution to fund the Plan. In other words, when the TVA paid more into the Plan than it had to, the Board allocated that surplus into the savings account. And in the future, the TVA could instruct the Board to dip into the savings account to pay part (and only part) of its yearly contribution. Plaintiffs claim that no other use of the savings account was permissible.

The problem is, from 2009–2013, the Board paid cost-of-living adjustments *entirely* from the savings account. And as a result, in Plaintiffs' view, the Plan's pot of funds for future cost-of-living adjustments is now smaller than it would have been absent the Board's alleged error. Plaintiffs' concern seems to be that, sometime down the road, if the Plan falls on hard times and the TVA refuses to make up any shortfall in available funds, the Plan will no longer have savings to fall back on in paying out cost-of-living adjustments.

But Plaintiffs' purported injury is neither particularized nor concrete. First, a beneficiary under a defined-benefit plan has an interest only in his defined benefits—not in the entirety of the plan's assets. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440 (1999) (explaining that, for purposes of a defined-benefit plan, plan members "have a right to a certain defined level of benefits," but not to "any particular asset that composes a part of the plan's general asset pool," including "a plan's surplus"). Here, the savings account was not a defined benefit. So the Plaintiffs had no particularized interest in it. Second, a beneficiary under a defined-benefit plan suffers an injury only where the challenged action puts his defined benefits in jeopardy. *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008) ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan."). In this case, depleting the savings account did not put the Plan at risk of default. So Plaintiffs suffered no concrete harm.

Relatedly, Plaintiffs' purported injury is also hypothetical. *See Spokeo*, 136 S. Ct. at 1548 (observing that an injury-in-fact must be "actual or imminent, not conjectural or hypothetical" (quoting *Lujan*, 504 U.S. at 560)). Plaintiffs will only be harmed *if* the Plan runs out of money and *if* the TVA refuses to make up the shortfall *while* Plaintiffs are still receiving benefits from the Plan. The Sixth Circuit and our sister circuits have concluded that plaintiffs lack standing premised on similar injuries. *See Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 583 (6th Cir. 2016) ("[T]he mere fact that a plaintiff pays funds into a non-compliant plan, if an injury at all, is 'neither concrete nor particularized, and is instead, arguably conjectural and hypothetical' and therefore does not satisfy injury-in-fact." (quoting *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007))); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d

523, 529–31, 546 & n.98 (5th Cir. 2016) (concluding that "constitutional standing for defined-benefit plan participants requires imminent risk of default by the plan, such that the participant's benefits are adversely affected," and collecting appellate decisions that have reached the same conclusion), *cert. denied*, 137 S. Ct. 1374 (2017). In one such case, the plaintiffs lacked standing despite the fact that plan managers' actions left the plan underfunded by nearly $2 billion. *Id.* at 546. As the court explained, "regardless of whether the plan is allegedly under- or overfunded, the direct injury to a participants' [sic] benefits is dependent on the realization of several additional risks, which collectively render the injury too speculative to support standing." *Id.* The same is true here.

Plaintiffs try to analogize to the law of trusts. They cite a case holding that the discretionary beneficiary of a trust suffers an injury-in-fact when the trustee misuses trust assets. *Scanlan v. Eisenberg*, 669 F.3d 838, 843 (7th Cir. 2012). This is so even though any distributions that the beneficiary might receive are purely discretionary. *Id.* at 844. So, according to Plaintiffs, just as a discretionary beneficiary can sue to preserve the trust corpus, Plaintiffs can sue to preserve the Plan's assets. This analogy, however, elides a key distinction. A discretionary beneficiary has an equitable interest in the trust corpus, *id.* at 843, but Plaintiffs identify nothing in the Plan's rules that gives members any interest in the savings account. Rather, Plaintiffs have an interest solely in their defined benefits, not in the "general pool" of Plan assets. *Hughes Aircraft Co.*, 525 U.S. at 439–40. Plaintiffs' analogy therefore falls flat. *See Lee*, 837 F.3d at 530 (rejecting similar trust-law argument); *accord David v. Alphin*, 704 F.3d 327, 336 (4th Cir. 2013).

Because Plaintiffs have suffered no injury-in-fact, they have no standing, and we have no jurisdiction over their accounting claim.

\* \* \*

We **AFFIRM** the district court's ruling that the Board gave proper notice of the 2009 amendments, **VACATE** its ruling with respect to Plaintiffs' accounting claim, and **REMAND** with instructions to dismiss the accounting claim for lack of subject-matter jurisdiction.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. This case presents complicated questions of contract law, administrative law, and pension law. The majority opinion bypasses these complications by deciding that ambiguous language in Tennessee Valley Authority Retirement System ("TVARS") rules and regulations is, in fact, unambiguous and by repurposing statutory precedents to conclude that plaintiffs lack standing to challenge the TVARS board's violation of its rules. Because I do not believe that the intricacies of this case can be so tidily smoothed over, I respectfully dissent.

## I. NOTICE OF PROPOSED AMENDMENT

Section 13 of the TVARS rules sets out the notice procedures that TVARS must follow to amend its rules and regulations. The section provides that the plan's

> Rules and Regulations may be amended by the board from time to time, provided that the board gives at least 30 days' notice of the proposed amendment to TVA and to the members, and further provided that TVA may, by notice in writing addressed to the board within said 30 days, veto any such proposed amendment, in which event it shall not become effective.

R. 126-6 (Rules & Regs. of the TVA Ret. Sys. at 63, § 13) (Page ID #1601). In their first claim, plaintiffs argue that the TVARS board violated § 13 when it voted to amend the plan's rules on August 17, 2009 without first giving thirty days' notice. Though the board indisputably provided notice of the amendment more than thirty days before the amendment went into effect, plaintiffs argue that the board should have given notice of the amendment before voting to approve it. According to plaintiffs, the board must vote twice before a possible amendment becomes effective. First, the board must vote to consider an amendment and then give TVA and plan members notice of the proposal. If TVA does not veto the proposal within thirty days of receiving notice of the proposal, and if the plan members do not successfully lobby against the proposal, then the board must vote again to approve the proposed amendment. The majority

opinion rejects plaintiffs' interpretation of § 13's notice requirement as unreasonable in light of § 13's "plain" meaning. *See* Maj. Op. at 4. I disagree.

What renders plaintiffs' interpretation unreasonable, according to the majority opinion, is not that it is implausible or irreconcilable with the text and purpose of the rules, but instead that another interpretation strikes the majority as better. According to the majority, the purported superiority of TVA and the board's interpretation of § 13 is evident from the terms "veto" and "effective." *See* Maj. Op. at 5. But the dictionary definition of "veto" upon which the majority heavily relies concerns the wholly inapposite legislative process of passing a bill into law. *See id.* (citing Black's Law Dictionary, which defines "veto" as "[a] power of one governmental branch to prohibit an action by another branch"). One might imagine that in the very different context of amending a public pension plan's rules and regulations, the term "veto" operates differently. And in any event, even if I were to grant that the term "veto" generally connotes the "power to nullify a formal action by another body," *see* Maj. Op. at 5, I do not see why the board's vote to propose a potential amendment to TVA should be viewed as any less of a "formal action" than a vote to propose an approved amendment to TVA. TVA may "nullify" the board's action under either plaintiffs' or defendants' interpretation of the rules.

I am also not persuaded by the majority's interpretation of the term "effective." Saying that a "proposed amendment . . . shall not become effective" if TVA exercises its veto does not mean that a proposed amendment will become effective if TVA opts not to exercise its veto. It is neither illogical nor atextual to read § 13 as allowing the board to decline to adopt an amendment that TVA has declined to reject. Indeed, one might reasonably think that because the power to *not* make a change to the rules rests with the board in the first instance (as TVA may veto an amendment, but not initiate one), the board retains its power to maintain the status quo even after it presents TVA with a possible change. The majority contends that plaintiffs' interpretation of § 13 renders the phrase "it shall not become effective" surplusage, *see* Maj. Op. at 5, but the phrase is surplusage under either party's definition: if TVA vetoes either a proposed amendment or an approved amendment, the amendment does not go into effect.

What is more, plaintiffs' proposed definition, in several respects, "far better accounts for the language at issue" than defendants' proposal. *See* Maj. Op. at 4. For instance, plaintiffs'

interpretation imbues the notice requirement with a sensible purpose—to give members an opportunity to lobby against a proposed amendment. Defendants, by contrast, are left arguing that the notice requirement is intended to enable members to make changes to their personal retirement plans in the thirty days between an amendment's notice date and its earliest possible effective date. But most members cannot change their retirement plans in thirty days, and it is hard to see why anyone would want to, given that TVA could veto the proposed amendment at any point in that thirty-day window. Plaintiffs also offer a more natural reading of the term "proposed amendment," in that they effectively define the term as "an amendment that has been proposed." The majority and defendants, meanwhile, read the term "proposed amendment" to mean "approved amendment"—an approach that is difficult to square with our admonition against "strained construction[s]" of contractual terms. *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894, 897 (6th Cir. 2004) (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). Finally, plaintiffs' interpretation better comports with this court's interpretation of the notice requirement required under the Administrative Procedure Act ("APA"). *See State of Ohio Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*, 862 F.2d 1228, 1233 (6th Cir. 1988) ("The purpose of the [APA's notice] provisions is to give those affected by the change an opportunity to participate in the rulemaking process.").[1]

Because the language in § 13 is at a minimum ambiguous, we must decide whether to defer to TVARS and TVA's interpretation of § 13 under *Auer v. Robbins*, 519 U.S. 452 (1997), which instructs courts to defer to agencies' interpretations of their own regulations, *id.* at 461, or whether we should instead apply the contractual doctrine of *contra proferentem* and construe the

---

[1]The district court declined to consider APA case law in interpreting the notice requirement in § 13 because "[t]he notice provisions of the APA . . . arise in an entirely distinct context and apply to agencies that are not comprised of members of the affected parties." *Evans v. Tennessee Valley Auth. Ret. Sys.*, No. 3:10-CV-217, 2017 WL 841138, at *6 (M.D. Tenn. Mar. 2, 2017). Undeniably, TVARS is structurally distinct from APA-governed agencies, in that three of the seven TVARS board members are elected by TVARS participants and three other board members are appointed by TVA, while no party representatives sit on the board of APA-governed agencies. *Duncan v. Muzyn*, 833 F.3d 567, 575 (6th Cir. 2016). However, this difference between TVARS and APA-governed agencies does not preclude the possibility that the notice requirement governing both types of agencies shares a similar purpose. After all, the thirty-day notice period is plainly designed to give TVA an opportunity to respond to a proposed amendment, even though three-sevenths of the TVARS board is appointed by TVA. It follows, then, that the TVARS notice requirement is also intended to elicit views from affected members.

ambiguous portions of § 13 against its drafter, the defendants. While *Auer*'s applicability might be a tricky question in a typical case, *see* Maj. Op. at 3 n.1, the law-of-the-case doctrine should guide our analysis here. *See United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990) ("[A] decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation."). In plaintiffs' first appeal in this case, we declined to grant *Auer* deference to TVARS's interpretation of its own regulations, in part because "TVA exercises substantial control over the retirement system," as evidenced by its "total control over the pursestrings," its veto power over proposed amendments, and its broader power to "dissolve[]" the "entire retirement system." *Duncan v. Muzyn*, 833 F.3d 567, 582 (6th Cir. 2016). "These aspects of the relationship between the agencies," we concluded, precluded deference to TVARS on issues with "significant ramifications for the TVA's funding responsibility." *Id.* Such reasoning applies with equal force in this second appeal. Although TVARS agrees with TVA's interpretation of § 13 in this appeal and disagreed with TVA's interpretation of the question at issue in the first appeal, this shift in alignment does not alter the agencies' unique relationship. The "junior agency/senior agency relationship" between TVARS and TVA, *id.*, makes it easier "to suspect that [TVARS's] interpretation [may] not reflect the agency's fair and considered judgment on the matter in question," *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011) (quoting *Auer*, 519 U.S. at 462), and may instead be influenced by the effect any given interpretation might have on TVA—particularly since three of TVARS's board members are appointed by TVA, *see Duncan*, 833 F.3d at 575.

The doctrine of *contra proferentem*, by contrast, fits well here. We have previously applied the rule of *contra proferentem* to construe against the drafter "language [in a pension plan that was] susceptible of more than one interpretation," *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846–47 (6th Cir. 2000), and the discussion above makes clear that two reasonable interpretations of § 13 exist. Though we have also hesitated to apply the doctrine of *contra proferentem* when reviewing an administrator's decision under the arbitrary-and-capricious standard, *see, e.g.*, *Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 81–82 (6th Cir. 2009), any tension between this contract-law doctrine and the deference typically associated with arbitrary-and-capricious review is alleviated here, where we have already held that *Auer* deference should not apply. Accordingly, I would construe § 13 in plaintiffs' favor, as the rule

of *contra proferentem* dictates, and thereby conclude that the TVARS board failed to abide by the notice requirements when it amended the rules to "cut some benefits" in 2009, *see* Maj. Op. at 2. As a result, the 2009 amendments should be invalidated. *See Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1296–97 (D.C. Cir. 2010) ("[A] failure to follow the amendment procedures of a plan invalidates an amendment without regard to a showing of bad faith."); *cf. Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84 (1995) (noting that ERISA-benefit-plan beneficiaries may argue that "unfavorable plan amendments were not properly adopted and are thus invalid"). Summary judgment on plaintiffs' first claim should therefore be awarded to plaintiffs.

## II. DEBITING OF EXCESS COLA ACCOUNT

In their second claim, plaintiffs contend that the TVARS board violated the plan rules when it drew from the Excess COLA Account to pay the plan's cost-of-living costs from 2009 through 2013. The Excess COLA Account was something like a rainy-day fund: it housed the surplus amount of funds that TVA paid into the retirement plan. *See* R. 126-6 (Rules & Regs. of the TVA Ret. Sys. at 52, § 10.D.1) (Page ID #1590). Before the 2009 amendments (which were never validly enacted), the rules authorized TVA to draw a limited amount from the Excess COLA Account to pay a percentage of the plan's cost-of-living costs each year. *See id.* at 50, § 9.B.6 (Page ID #1588). The TVARS board, however, paid 100% of the plan's cost-of-living costs out of the Excess COLA Account from 2009 through 2013. R. 213-1 (TVARS's Response to Interrogs., Ex. A at 1) (Page ID #3322). Plaintiffs argue that such debiting violated the rules, diminished the plan's rainy-day fund, and improperly relieved TVA of future funding obligations. *See* Appellant Br. at 28; Appellant Reply Br. at 13–14.

The majority opinion sidesteps the above arguments by holding that plaintiffs lacked standing to bring this claim because "the Board's challenged accounting actions" constituted "a bare procedural violation" that did not cause plaintiffs any harm. *See* Maj. Op. at 7 (second quote quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). Although the majority acknowledges plaintiffs' concerns (i.e., by debiting the Excess COLA Account, TVARS "shrank the fund set aside to ensure future COLA benefits," Appellant Br. at 28), it holds that this "purported injury is neither particularized nor concrete," Maj. Op. at 8. Again, I disagree.

Focusing first on particularization, the majority cites *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999), for the proposition that "a beneficiary under a defined-benefit plan has an interest only in his defined benefits—not in the entirety of the plan's assets." Maj. Op. at 8. In *Hughes*, the Supreme Court considered whether an employer "violated ERISA's prohibition against using employees' vested, nonforfeitable benefits to meet its obligations by depleting [a pension fund's] surplus to fund [an alternative] noncontributory structure." 525 U.S. at 437. The Court determined that the employer did not, in fact, "violate[] ERISA's vesting requirements by using assets from the surplus attributable to the employees' contributions to fund the noncontributory structure" because "ERISA's vesting requirement is met 'if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable,'" and a plan's surplus is not an "accrued benefit" as that term is defined under ERISA. *Id.* at 440–41 (quoting 29 U.S.C. § 1053(a)(1)).

As the above summary shows, *Hughes* does not support the broad position that the majority ascribes to it. As an initial matter, *Hughes* concerned a private pension plan governed by ERISA, and ERISA does not apply to governmental pension plans such as TVARS, *see Duncan*, 833 F.3d at 571. It is not clear that the *Hughes* Court's discussion of how defined-benefit plans operate within ERISA ought to be extrapolated to the government-pension-plan setting. But even if *Hughes* could be read as announcing defined-benefit-pension-plan principles more broadly, it has no bearing on the issue of standing. In saying that "no plan member has a claim to any particular asset that composes a part of the plan's general asset pool," 525 U.S. at 440, the *Hughes* Court did not suggest that plan members lack Article III standing to challenge the depletion of plan assets. Rather, the Supreme Court concluded that the pension plan in *Hughes* had not misused plaintiffs' vested, nonforfeitable assets, and therefore the plaintiffs' claim to that effect was "meritless." *Id.* at 441. Put differently, *Hughes* stands for the uncontroversial proposition that plaintiffs who have a statutory right to certain vested interests may not complain that their statutory right has been impinged when an employer arguably misuses other, non-vested interests. *See id.* The case is silent as to plan members' constitutional standing to object to the misuse of plan assets on other grounds.

True, the Supreme Court has explained—again, while interpreting a provision of ERISA, and not with regard to Article III standing—that "[m]isconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008). Even setting aside my objection to applying statutory interpretations to constitutional questions, *LaRue* does not preclude standing here. Plaintiffs argue that debiting the Excess COLA Account "shrank the special fund set aside to 'pay all these COLAs over some time period with some level of confidence.'" Appellant Reply Br. at 13–14 (quoting R. 213-3 (TVARS 30(b)(6) Dep. at 96–97) (Page ID #3361–62)). Arguably, then, the board's misconduct "enhance[d] the risk of default by the entire plan," and thus "affect[ed] an individual's entitlement to a defined benefit." *See LaRue*, 552 U.S. at 255.

Nor do I believe that plaintiffs' "purported injury" is too "hypothetical," as the majority contends. *See* Maj. Op. at 8. The majority relies exclusively on ERISA cases in rejecting plaintiffs' alleged harm as overly speculative. Because of ERISA's statutory safeguards, the effect of a depletion of plan assets on accrued benefits may be more speculative in the ERISA setting than it is here. As the Supreme Court noted in *LaRue*, the risk of default associated with private pension plans "prompted Congress to require defined benefit plans (but not defined contribution plans) to satisfy complex minimum funding requirements, and to make premium payments to the Pension Benefit Guaranty Corporation for plan termination insurance." 552 U.S. at 255. TVARS members do not benefit from those same procedural requirements and insurance backstops. (Though § 9 of the rules lays out minimum funding requirements, the 2009 amendments make clear that TVARS can, and does, amend those funding requirements.) As a result, the reduction of plan assets is more likely to harm directly defined-benefit-plan beneficiaries than ERISA-plan beneficiaries, and therefore the risk of injury is not too speculative to support standing for the former, even if is for the latter.[2]

---

[2]Our opinion in *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576 (6th Cir. 2016), does not compel a different conclusion. There, we held that participants in a welfare-benefit plan governed by ERISA lacked standing to sue the plan and its fiduciaries for failing to comply with ERISA and the Affordable Care Act because the plaintiffs' "ma[d]e no showing of actual or imminent injury to the Plan itself." 844 F.3d at 585. Although the fiduciaries' failure to abide by the ACA purportedly "expose[d] the Plan to *prospective* liability in the amount of $15,000,000," the plaintiffs provided no "evidence that penalties have been levied, paid, or even contemplated." *Id.*

Moreover, "canonical principles of trust law" indicate that plan members have standing to sue for misuse of plan assets, even without showing a probable financial loss. *See Scanlan v. Eisenberg*, 669 F.3d 838, 843 (7th Cir. 2012). The Supreme Court recently reemphasized that history plays an "important role[]" in "determining whether an intangible harm constitutes injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), *as revised* (May 24, 2016). As the Court explained, "[b]ecause the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* TVARS is, as plaintiffs note, a benefit trust, *see* R. 126-6 (Rules & Regs. of the TVA Ret. Sys. at 11, § 4.1) (Page ID #1549), and "equitable principles of trust law" dictate that trust beneficiaries have "a legally protected interest in Trusts' corpus and in the proper administration of that corpus," even if the trust is not at immediate risk of insolvency. *Scanlan*, 669 F.3d at 846–47. It follows, then, that the plan members here have standing to sue for TVARS's allegedly wrongful depletion of the Excess COLA Account.

The majority rejects this argument by highlighting two out-of-circuit cases that required ERISA plaintiffs to demonstrate an "imminent risk of default by the plan" to establish standing, contrary to common-law trust principles. *See Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 546 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017); *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013). Neither case is convincing. In *Lee*, the Fifth Circuit expressly declined to consider whether the plan member had "standing based on common-law trust principles," because the plaintiff had "failed to raise his trust-law theory in the district court and did not press it in his opening brief to this court beyond making a passing reference to 'historical authorities.'" *Id.* at 530. The *Lee* court's rejection of the plaintiff's trust-law argument therefore turned on procedure rather than substance. And in *David*, the Fourth Circuit rejected pension-plan participants' argument that they have standing to sue the plan administrators based on common-

Under those circumstances, the plaintiffs' "risk-based theories of standing [were] unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle." *Id.* (quoting *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013)). Here, by contrast, plaintiffs allege that defendants *actually* depleted the pension plan of $427,570,384. The injury to the plan, and thereby the risk of injury to plaintiffs, is therefore far more concrete in the present case than it was in *Soehnlen*.

law principles of trust law because the plan participants "provide[d] no authority for the proposition that trust law principles extend to the ERISA context to confer Article III standing . . . where the plan is overfunded when the claims are filed and any surplus funding will revert to the plan only." 704 F.3d at 336. Such reasoning is difficult to square with the Supreme Court's longstanding recognition that "ERISA abounds with the language and terminology of trust law," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), and its admonition to treat "trust law . . . [as] a starting point" in analyzing ERISA's provisions, *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Though ERISA may "depart[] from common-law trust requirements" in some ways, *id.*, the *David* court erred by presuming that trust law is inapposite unless proven otherwise. Indeed, at least one other circuit has already rejected the *David* court's reasoning: in *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46 (1st Cir. 2014), the First Circuit turned to "the common law of trusts" to explain why participants in an ERISA-governed welfare-benefit plan could sue the plan's insurer for breaching its fiduciary duties by unlawfully retaining and misusing their assets, even though "the plaintiffs did not suffer any demonstrable financial loss as a result of the insurer's alleged transgressions." *Id.* at 52–53.

On the merits, plaintiffs raise a thorny claim. On the one hand, the rules specifically dictate how and when "[t]he Excess COLA Account shall be charged"—circumstances that do not include the 100% debiting that occurred in this case. *See* R. 126-6 (Rules & Regs. of the TVA Ret. Sys. at 52, § 10.D.2) (Page ID #1590). On the other hand, the rules do not expressly forbid the board's conduct in this case. I can see plausible arguments on both sides. What I cannot do, however, is agree to avoid resolving the issue on standing grounds when longstanding principles of trust law require us to hear plaintiffs' claim.

For these reasons, I respectfully dissent.